# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TIMMY GOODWIN                       :
                                    :
      Petitioner,          :    C.A. No. _____
                                    :
    v.                         :
                                    :
STATE OF DELAWARE and               :
DEPARTMENT OF CORRECTIONS,           :
                                    :
      Respondents.         :

## PETITIONER'S MEMORANDUM FOR WRIT OF
## HABEAS CORPUS UNDER 28 U.S.C. § 2254

Petitioner Timmy Goodwin, by and through his attorney Leo John Ramunno, Esq. request this Honorable Court for a Writ of Habeas Corpus under 28 U.S.C. § 2254 and present the memorandum in support of his Writ of Habeas Corpus.

Timmy Goodwin was arrested on the charges of Kidnapping First Degree, Kidnapping Second Degree and Unlawful Sexual Intercourse. Goodwin was accused of kidnapping the victim and her sixteen month old daughter by commandeering the victim's car in the early morning hours of July 5, 1987 and forcing the victim to engage in oral sexual intercourse with him.

Goodwin's convictions resulted from events occurring at about 2:00 a.m. on July 5, 1987. At that time, it was alleged that Goodwin convinced a Maryland women to stop her car, by flashing the headlights of his van, and then forced her to engage in various sexual acts with him. The victim alleged that after the ejaculation, he wiped his penis on a baby blanket that was in the car.

At trial, the victim testified that she and Goodwin were strangers. Goodwin on the other hand, claimed that the victim and he had engaged in sex numerous times in the weeks prior to July 5 in exchange for his providing her with drugs. He contended she had fabricated the story of her abduction and rape after he told her he could no longer continue the relationship because he was returning to his estranged wife. He also presented an alibi defense.

Goodwin was convicted of Kidnapping First Degree, Kidnapping Second Degree and Unlawful Sexual Intercourse in February of 1988. These convictions were reversed by this Court on appeal due to a discovery violation by the State. *Goodwin v. State*, Del.Supr., No. 267, 1988, Holland, J. (Dec. 20, 1989) (ORDER). The case was retried before a jury in September of 1990. However, the jury was unable to agree on a verdict and a mistrial was declared. The case was retried again before a jury in December of 1990 at which time Goodwin was convicted of all offenses charged. He was sentenced to consecutive life terms of imprisonment.

The baby blanket was not used in the first trial do to the following ruling from the Court:

> Mr. Willard:   Your Honor, may I address the Court? Your Honor made a ruling about the evidence of the serology, the blood matching with the semen and the saliva. And my question is can - - will the State mention those two things, or will they not be mentioned at all?

> Mr. Wharton:  Your Honor, I think it would probably be best to put on the record the entire context in which this case came up, because we were talking in chambers off the record and also at the call we were off the record.

Mr. Willard, at the call, requested a rescheduling based on the lack of time to investigate, consult with an expert concerning the most recent FBI report, which was dated December the 30th, 1987, and which was provided to him by letter dated January 22, of this year, which indicates that there was semen found on a baby blanket which reveals presence of the H or O blood group substance - - the defendant is  - - does have that blood group as his own - - and additionally, as a secretor, due to the fact that his blood group can be ascertained from the saliva. It's in essence, a summary of the FBI report dated December 30th.

The State had indicated that, you know, there had been no request for a rescheduling at the Thursday afternoon calendar call, that the victim had traveled a great distance from Texas to be here today, and we opposed a continuance.

Your Honor suggested on resolution of it would be to proceed with trial, but to exclude that evidence. The State agreed to that with the understanding that there would be not mention by either side of any blood typing, semen typing or anything of that nature, either the presence of it or the absence of it being raised by either side. That was the understanding the State proceeded upon when the jury was selected.

Mr. Willard:    Your Honor, no evidence of testing, but I'm saying the State does intend to introduce evidence that the blanket - -

Mr. Wharton:  Well, you know, I think - - I think - -

Mr. Willard:    My problem, Your Honor, is that calls from expert testimony, that there is semen on the blanket. For somebody to say it was semen is expert testimony.

Mr. Wharton:  Absolutely. And the State wouldn't be calling anybody to testify that there was semen found on the blanket. I mean, the victim may well

say, in her description of events, that after this was concluded, he wiped himself
with the blanket, but that doesn't; get to the - -

    Mr. Willard:    Then, Your Honor, we are fine. That is my understanding
also. Thank you, Your Honor.

The agreement was that neither side would be able to mention the evidence that
was taken from the baby blanket such as blood typing; semen typing; or, anything of that
nature, and only that the victim was able to testify that the person had wiped himself off
with the blanket. Judge Babiarz never knew about the destruction of the baby blanket
when he made a ruling about that agreement. The destruction of the blanket happened in
1989 and Judge Babiarz's ruling was in 1990. The Petitioner was convicted of the
charges and appealed his conviction which was reversed and remanded for retrial.

During the appeal, the State destroyed the baby blanket. At the Petitioner's second
trial, he was represented by the Public Defender's Office who claimed they knew nothing
about the agreement. During closing argument, the Public Defender made a statement to
the jury "where's the baby blanket" and the State objected. The trial Court ruled that the
prior agreement was binding and ordered counsel not to make any more statements about
the blanket. This trial ended in a hung jury and a mistrial was granted.

After the mistrial, the State changed its position and were going to use all the
evidence that had been taken from the baby blanket. The Court in the third trial allowed
the State to present evidence that was taken from the baby blanket that the semen on the
baby blanket matched the Petitioner's blood group along with 36 percent of the
population. Further the Court allowed the State to share a picture of the baby blanket to
the jury but refused to tell the jury that the baby blanket was destroyed or give any

missing evidence instructions. The following is a summary of the evidence presented at his third trial.

Timmy Goodwin was accused of kidnapping Susan Kellum and her young daughter by commandeering Kellum's car in the early morning hours of July 5, 1987 on the Old Baltimore Pike near the Maryland Delaware border and thereafter forcing Kellum to engage in non-consensual oral intercourse. The prosecution's contention was that Goodwin and Kellum were strangers, (TA-45; A-50), and that Goodwin was fulfilling a "fantasy to receive oral intercourse from a woman as he was driving a car down a roadway." (TA-37; A49). At trial, Kellum would deny ever being with Goodwin prior to this incidence or having ever engaged in sex or consuming cocaine with him. (TA-133; A-81). The defense contended otherwise. As announced in the opening statement of defense counsel, the defendant contended, inter alia, that Goodwin had an alibi for the time in question, that Kellum's claim of abduction and sexual assault was a fabrication, that Kellum and Goodwin were not strangers, and that Kellum and Goodwin were involved in an approximately five week-long relationship involving consensual sex and drugs in the late spring and early summer of 1987. (TA-54; A-52). The heart of the defense case was that there was a sex-for-drugs relationship between Kellum and Goodwin. (TC-45; A-201).

Kellum's claim was that the alleged incident occurred at approximately 2:30 a.m. shortly after she began the 20 minute drive from her parents' home in Buck Hill Farms, Maryland, where she resided, to her grandmother's house in Delaware. (TA-76, 77, 78, TB-5; A-60-62, 186). According to Kellum, she pulled off to the side of the road just after turning onto Old Baltimore Pike, being signaled to do so by the operator of a white

van behind her. (TA-81-82, 107; A-63-64, 75). The stopping point was towards the end
of the houses on the Maryland side of Old Baltimore Pike. (TA-107; A-75). The white
van's operator came to her automobile door posing as an undercover police officer and
reached into Kellum's car, grabbed her keys from the ignition, grabbed her neck, and
threw her to the passenger seat. (TA-82-83; A-64-65). The white van's operator then got
into the car and drove off with both her and her daughter in the car and entered the State
of Delaware. (TA-84; A-66). The white van's operator told Kellum that he wanted her to
perform fellatio upon him. (TA-85; A-67).

According to Kellum, she complied out of fear of injury to her and her baby, who
was with her during the entire episode, (TA-85, 87, 162; A-67-67, 94), and was forced to
perform fellatio "almost the whole time." (TA-89; A-69). The white van's operator kept
her pushed down on the passenger's side of the floor during the approximately three
hours she was with him. (TA-89, 92, 98; A-69-70, 73). Kellum claimed that the white
van's operator had initially grabbed her by the neck and threw her into the passenger seat,
(TA-115; A-77), and had repeatedly pulled her by the hair and pushed her down during
the episode. (TA-130-131; A-79-80). Kellum conceded that she needed no medical
attention after this alleged incident. (TA130; A-79). Two days later, Kellum identified
Goodwin as the alleged perpetrator from a photographic line-up, (TB-151, 155; A-144,
148), and identified him again at trial. (TA-99; A-74).

At the conclusion of this episode, Kellum did not make the short drive back to her
house to seek the comfort and assistance of her parents, but made the much longer drive
to her grandmother's house, where she arrived shortly after 5:00 a.m., (TA-93; A-71).
Kellum gave a 27 page taped statement on the morning of the alleged abduction which

was introduced as an exhibit and played before the jury, over defense objections, together with a transcript of that statement. (TB-187-188; Exhibits B & P; A-180-181). [1]

Cheryl Spath, who was Kellum's cousin and resided with their grandmother, was told by Kellum upon her arrival that she had been raped. (TC-70; A-202). Spath recalled that she saw Kellum about 5:00 a.m. that morning, (TC-141; A-211), and that it took perhaps five or ten minutes to calm Kellum down after her arrival, whereafter Spath called the police. (TC-71; A-203).

Officer Warren, of the New Castle County Police Department, testified that on July 5, 1987, he was dispatched at approximately 0528 hours to Kellum's grandmother's residence at 26 Deer Run Road, Newark, Delaware in response to Kellum's rape complaint. (TB-4-5; A-95-96). Kellum's rape complaint was called in to the police dispatcher at 5:28 a.m. as a rape in progress rather than a completed rape. (TB-13; A-99). According to Warren, Kellum was crying hysterically upon his arrival and it took approximately 30 minutes before Warren was even able to get Kellum's name from her. (TB-5; A-96). Subsequently, Kellum told Warren that she had been stopped by a white van in Delaware or very near the Delaware/Maryland line on Old Baltimore Pike at approximately 2:30 a.m. that morning. (TB-5-6; A-96-97). Kellum further told Warren that the operator of that van, posing as an undercover police officer, approached her vehicle, opened her door, grabbed her around her neck, pushed her into the passenger seat, got into the driver's seat and drove the vehicle into Delaware. (TB-6-7; A-97-98). Kellum told Warren that the operator of the white van demanded that she perform fellatio upon him, threatened her, and that she had complied. (TB-7; A-98). Warren, who was

---

[1] The statements were admitted over prior defense objections that the statutory requirements of 11 Del. C. § 3507 had not been satisfied. (TB 188).

with Kellum for approximately two hours that morning, observed no physical injuries. (TB-14; A-100).

Officer Gregory Coughlin testified that on July 5, 1987, he processed Kellum's vehicle for fingerprints. (TB-40, 47; A-111, 113, 115). Officer David Nesler, employed by the Wilmington Police Department, a fingerprint expert, identified the fingerprints taken from the inside of the rear view mirror of the Kellum vehicle as well as the left palm print on the inside glass of the driver's side door of the Kellum vehicle as belonging to Timmy Goodwin. (TB-148-149; A-116-117). Over strenuous defense objection, Coughlin was permitted to express the opinion that those prints were less than 24 hours old. (TB-67-68; A-128-129).

Wayne W. Oakes, an agent with the Federal Bureau of Investigation, testified that once of the pubic hairs found in the vacuum sweepings from the Kellum vehicle matched the known pubic hair standards of the defendant. (TB-110; A-135). Oakes did not eliminate Kellum as a possible source of pubic hair in question. (TB-114; A-136).

Robert W. Holt of the Federal Bureau of Investigation, a trained serologist, (TB-122; A-137), testified that the child's baby blanket, taken from the Kellum vehicle had semen on it. (TB-132; A-139). Holt further testified that the semen on the blanket came from a male type "O" secretor. (TB-133; A-140). Thirty-two (32%) percent of the population is designated as type "O" secretors. (TB-133; A-140). Holt testified that the defendant is a type "O" secretor based on the analysis of the defendant's saliva sample. (TB-129; A-138). Holt was not able to state, with any degree of certainty, that the semen came from the defendant, but only that he could not eliminate the defendant as being the source of the semen. (TB-133; A-140).

Detective Vera Briscoe was the primary investigator of the charges in this case. (TB-159). She first met Kellum approximately 7:0 a.m. on July 5, 1987, at the New Castle County Police Headquarters. (TB-159; A-152). Kellum reported no physical injuries to Briscoe. (TC-27; A-193). Kellum did tell Briscoe in their first interview that she thought that her estranged husband might have been involved in the incident. (TC-14; A-188). Kellum and her husband had been separated since October 28, 1986, when Kellum returned to the State of Maryland. (TA-126; A78). Immediately upon her return to Maryland, Kellum obtained an award of temporary custody of their children to prevent her husband from taking physical custody. (TA-126; A-78).

Because Kellum's story centered around a white van with and estimated model year of 1973-74, whose operator allegedly stopped her 500 feet from the Maryland/Delaware line, (TC-18-19; A-190-191), the defense established the likelihood of the story's fabrication through police and civilian testimony that an inoperable 1972 white van had remained in a driveway one-tenth of a mile, or approximately 500 feet from the Maryland/Delaware line since 1987. Detective Briscoe agreed both vans would have been very one another if Kellum's story is in fact true. (TC-20; A-192).

Officer Michael McFadden, New Castle County Police Department, testified that on July 5, 1987, he went to 645 Old Baltimore Pike, in the State of Maryland, approximately a tenth of a mile from the Delaware/Maryland line. (TB-25; A-106). While there, he inspected an older white van and concluded that because of its physical appearance, it hadn't been driven in quite a while. (TB-25-27; A-107-108). The white van was visible from the roadway. (TD-7; A-218). Officer McFadden also spoke to the occupant of the premises, Joanne Baffone. (TB-26; A-107). Baffone had lived at 645 Old

Baltimore Pike a/k/a Red Hill Road, Elkton, Maryland, since 1961. (TD-5-6; A-216-217).

McFadden never asked Baffone whether she had observed a white van parked beside Old

Baltimore Pike. (TE-45; A-349). The inoperable white van in her driveway had to be

towed there by her husband for him to work on and "had been there for quire a few

months and it was just sitting there." (TD-6-7; A-217-218) According to Baffone, there

was no possible way to start the van in her driveway since the motor was torn apart. (TD-

20; A-224).

     Baffone's testimony cast serious suspicion on Kellum's claim in another

significant way. Baffone had fallen asleep around 11:00 on the evening of July 4, 1987,

after hosting a party at her house, and awoke at 4:00 a.m. on the morning of July 5, 1987.

(TD-9; A-219). Unable to return to sleep, she went outside with her dog and cleaned up

from the aftermath of the July 4th party. (TD-9; A-219). She was outside from "about four

o'clock to a quarter of five." (TD-10; A-220). While outside, Baffone observed no

activity whatsoever, nor did she observe a white van parked on the side of the roadway.

(TD-9-10; A-219-220). When the prosecution suggested on cross-examination that

Baffone might have forgotten some of the details of July 5, 1987, she responded, "It was

something I never forgot, because I was out there when supposedly something like that

happened. It was like – so I did not forget. So, you know, I did remember." (TD-12-13;

A-221-222). Baffone was certain that she went outside at four o'clock in the morning,

since she remembers looking at the clock. (TD-14; A-223). Baffone knew neither

Goodwin or Kellum, (TD-6; A-217), and the prosecution conceded that she "admittedly

has no axe to grind in this case, [and] doesn't know anybody. She's kind of fortuitously

involved, coincidentally involved by virtue of where she lives." (TF-60; A-355).

The likelihood that Kellum's story was a fabrication was increased by her belief that no one was out in any of the yards near the alleged abduction scene due to the lateness of the hour. (TA-114; A-76). At any rate, Detective Briscoe never confronted Kellum concerning the white 1972 van located at the Baffone residence to test the veracity of her story, even though Kellum acknowledged driving past the residence quite frequently, (TC-17-18; A-189-190), and despite the fact that Briscoe had asked the Maryland authorities to investigate whether anyone had seen a van parked at the side of the road as reported by Kellum and had received a negative response. (TC-27; A-193). Briscoe's investigation did not find anyone who could confirm Kellum's claim that the defendant had parked a white van along the side of Old Baltimore Pike for a period of several hours during the early morning hours of July 5, 1987. (TC-27; A-193).

Goodwin denies having any form of consensual or nonconsensual sexual intercourse with Kellum on July 4, 1987, and denied abducting Kellum or her daughter. (TD-89, 100; A-265, 276). Goodwin testified that he first met Kellum in 1983 when she was dating Larry Kellum, whom Goodwin had known for a long time. (TD-82; A-258). Goodwin had not seen Kellum from 1983 until an occasion in May 1987, when she walked into the pool room of the Four Corners bar in Elkton, Maryland. (TD-83; A-259). Goodwin recalls that Kellum came up to him and said "Don't you remember me?" (TD-83; A-259). Goodwin responded affirmatively when Kellum went inquired whether he had anything she could "get high on." (TD-83; A-259). Goodwin and Kellum went outside and ingested cocaine; however, nothing further transpired between the two that evening. (TD-85; A-261). On a subsequent occasion, which Goodwin believes was the very next weekend; Kellum came back into the Four Corners bar. The two left together,

ingested cocaine, and, as "one thing led to another," engaged in voluntary sexual intercourse. (TD-86; A-262). From that occasion until July of 1987, Goodwin recalls that this scenario recurred approximately four or five times. (TD-87; A-263). The side where Goodwin and Kellum engaged in sexual intercourse was the Hollingsworth Manor neighborhood park, either in Kellum's car or on the ground near the woods. (TD-95; A-271). The State's rebuttal witness, Cheryl Everett, testified that Goodwin's wife was aware that he was having extramarital affairs. (TD-194, A-194).

Like Kellum, Goodwin was experiencing marital difficulties and was living "on and off" between his wife's and father's residence. (TD-33, 85-86; A-228, 261-262). With respect to the evening of July 4, 1987, and the early morning hours of July 5, 1987, Goodwin testified Kellum came into the Four Corners bar sometime prior to midnight. (TD-88, 102; A-264-278). Once again, they left the bar and ingested cocaine in Kellum's car. This was the last time he saw Kellum prior to his arrest. (TD-89, 100; A-265, 276). On this occasion, Kellum began to cry, citing family problems. (TD-89, A-265). At this time, Goodwin told her that he was trying to reconcile with his wife and wanted nothing further to do with Kellum. (TD-89, 90; A-265-266). This upset Kellum, who became hysterical and told Goodwin to get out of the car. (TD-89; A-265); Kellum accused Goodwin of "using" her; Goodwin does not dispute that he hand been "using" Kellum for sex. (TD-89; A-265).

Sometime after Goodwin returned to the bar, his then-wife, Linda Goodwin, came into the gar and the couple made plans to meet at her house. (TD-90; A-266). This salient fact was corroborated not only by testimony of his now ex-wife, Linda Goodwin, but also by the State's rebuttal witness, Cheryl Everett. (TD-32-34, 178-180; A-227-229, 328-

330). At that time, Linda Goodwin was living in Winding Brook Village, which is

located on the Newark-Elkton Road. (TD-178; A328). Goodwin's brother, who lived in

Conowingo, Maryland, and was driving Goodwin that evening, declined to bring

Goodwin that far and instead dropped him off at their father's house in Hollingsworth

Manor. (TD-91-92; A-267-268). This salient fact was corroborated not only by the

testimony of his father, Alva Goodwin, (TD-46-47; A-241-242), but also by the

testimony of his ex-wife. (TD-35-36, 41; A-230, 236). Both Goodwin and his wife

testified that they thereafter went to bed for the evening. (TD-37, 92; A-232, 268).

Goodwin was awakened the next morning at about 8:00 a.m. by his ex-wife, who had

arisen at 7:15 a.m. (TD-93; A-269).

The unexpected appearance of Linda Goodwin at the Goodwin residence was

corroborated to a large degree by the testimony of Sergeant James B. Just, formerly

employed by the Elkton Police Department. (TC-28; A-194). Sergeant Just testified that

on July 5, 1987, he stopped a vehicle in Hollingsworth Manor on Road 5 at

approximately 2:00 a.m. and eventually issued a citation to Cheryl Lynn Everett, the

operator. (TC-29; A-195). The exact date and location of the ticket's issuance was July 5,

1987, 2:20 a.m., Road 5, Hollingsworth Manor. (TC-30; A-196). Everett had a white

female passenger in the car, whose identity was unknown to Sergeant Just, (TC-30; A-

196); that passenger was, of course, Linda Goodwin. (TD-35, 182; A-200, 332). Because

he had no reason to have the passenger remain at the scene, Just allowed her to walk

away from the scene of the stop. (TC-30-33, 182; A-196-199, 332). Linda Goodwin then

merely traveled to the residence of the defendant's father, a distance of two blocks. (TD-

35; A-200). During her rebuttal testimony, Everett confirmed that she never saw Linda

again that morning, notwithstanding their previous plans to meet at Linda Goodwin's

Winding Brook residence and Linda Goodwin's lack of transportation. (TD-183; A-333).

The State called Everett to testify in rebuttal that Goodwin had offered her One

Thousand ($1,000.00) Dollars to provide him with an alibi by testifying that he had left

the Four Corners bar that evening together with both Everett and Linda Goodwin. (TD-

184-185; A-334-335). However, on cross-examination, Everett testified that Goodwin's

offer was not a serious one. (TA-198; 647). Goodwin denies outright the suggestion that

he had offered Cheryl Everett any money to be an alibi witness for him. (TD-105; A-

251).

Goodwin was employed at the time of his arrest by Jerry Smith, a construction

contractor from Charlestown, Maryland, whose local projects included the Delaware

Association of Police on Lancaster Avenue, the Budget Motel in New Castle, and the

Southgate Industrial Park. (TC-88-89; A-204-205). In July, 1987, they were engaged in

construction work at the Budget Motel in New Castle County. (TC-90; A-206).

Goodwin's employer provided transportation for him and two fellow employees, Johnny

Bristow, who lived in Hollingsworth Manor, and Lonnie Wadell who lives in Winding

Brook Village. (TC-97; A-210). Goodwin's employer testified that in the time-frame of

June and July 1987, "it was not uncommon for him to drop Timmy off" in Buck Hill

Farms to visit a girl named Susan, who had visited Goodwin at the "Budget Motel site.

(TC-92-93, 96; A-207-209). Buck Hill Farms is the development which Kellum resided

at the time of the alleged incident. (TA-71; A-59).

A major premise of Goodwin's defense was the he and Kellum had a previous

consensual sexual relationship which revolved around Kellum's use of cocaine with him.

(TC-45; A-201). The State contested not only this premise but also the minor premise that Kellum ever knowingly possessed cocaine. (TA-137; A-84). To establish the plausibility of Goodwin's testimony as to Kellum's cocaine usage, the defense introduced evidence of her use of cocaine both prior to and subsequent to the alleged July 5, 1987 incident.

Kellum denied ever using cocaine with Goodwin. (TA-133; A-81). However, six months prior to the alleged offenses, Kellum told her cousin, Cheryl Spath, at a New Year's Eve party that she had tried cocaine. (TE-26; A-348). On February 5, 1988, Kellum was found in possession of a white powdery substance by the Cecil County Sheriff's Department during an inventory search of her purse pursuant to her arrest on an outstanding warrant. (TC-147, 153-154; A-213-215). This white powdery substance was subsequently determined to be cocaine by Sandra Hartsock of the Maryland Police Crime Lab in Pikesville, Maryland. (TD-140-141, 145-146; A-316-319). [2] Kellum denied being in <u>knowing</u> possession of the eight grams of cocaine found by the police officers in February of 1988 (TD-155-156, A;-324-325), and testified that her drug possession charge was eventually dropped because of a technicality. (TD-156-157; A-325-326).

Another significant line of evidence tending to exculpate Goodwin centers around the fact that Kellum detected no odor of alcohol on her purported assailant, (A-35), even thought Goodwin had been drinking as late as 1:20 a.m. (TD-34, 52, 55, 88, 179; A-229, 247, 250, 264, 329).

---

[2] Even though the State had been provided all the paperwork from the Maryland authorities, (TA-137; A-84), it was unwilling to concede that the substance found in Kellum's purse was cocaine and required that the defense procure the live testimony of Ms. Hartsock, a Maryland government employee. (TA-143, 144, TD-140; A-87m 88, 316).

**The Petitioner was Denied Effective**
**Assistance of Counsel in His Trial and Appeal.**

To prevail on a claim of ineffective counsel, Goodwin must show:

(1)    That trial and appellant counsel's representation fell below an objective standard of reasonableness; and

(2)    That there was reasonable probability that, but for counsel's professional errors, the result of his trial would have been different. Strickland v. Washington, 466 U.S. 668, 694 (1984).

In this case, Goodwin alleges that his counsel:

(1)    Failed to conduct an appropriate pre-trial investigation. Specifically, Goodwin believes that defense counsel did not discover the destruction of the baby blanket within an appropriate time or to advise his of the destruction until trial. Furthermore, Goodwin trial counsel failed to retain experts to provide testimony considering the blood typing and that DNA testing would be more reliable and could eliminate the Petitioner as the donor.

(2)    Failed to properly prepare for trial by conducting no investigation, failing to make complete discovery, failing to retain experts, failing to adequate advise Petitioner to all facts considering trial and failing to file an appropriate motion to suppress the evidence from the blanket.

(3)    Failed to adequately represent Petitioner in his appeal.

It is settled law in this jurisdiction and others that the failure to adequately investigate matter relating to the guilt and punishment of a defendant is constitutionally

unreasonable. See <u>State v. Jermaine Wright,</u> Del.Supr., I.D. No. 91004136, Del Pesco, J.

(August 12, 1994) (Mem.Op.) Pp.16-28 (Exhibit "D".) <u>United States v. Gray,</u> 3rd Cir.,

878 F.2d 702, 711 (1989); <u>Foster v. Lockhart,</u> 8th Cir., 9 F.3d 722 (1993). Reasonable

performance of counsel includes an adequate investigation of the facts, the consideration

of viable theories, and the development of evidence to support those theories. <u>Venable v.</u>

<u>Neil,</u> 6th Cir., 463 F.2d 1167 (1972) (ineffective assistance where court-appointed

attorney only briefly spoke with the defendant and refused to listen to his version of the

shooting or to investigate the surrounding circumstances); <u>Application of Tomich,</u>

D.Mont., 221 F.Supp. 500 (1963), <u>affirmed,</u> 9th Cir., 332 F.2d 987 (1964) (ineffective

assistance of counsel where counsel failed to consult with and listen to the defendant's

story and otherwise investigate available defenses). This includes the interviewing of

available witnesses, see <u>Harris v. Towers</u>, D.Del., 405 F.Supp. 497 (1974), and obtaining

independent reviews of available physical evidence, see <u>Beasley v. United States</u>, 6th Cir.,

41 F.2d 687 (1974). It is clearly substandard for counsel not to investigate or interview

witnesses made available to him by the defendant. <u>United States v. Gray,</u> <u>supra</u>.; <u>Gaines</u>

<u>v. Hopper,</u> 5th Cir., 575 F2d 1147 (1978) (ineffective assistance of counsel where trial

counsel failed to interview anyone other than the investigating police officer and two

cohorts in the crime).

      An attorney must make a reasonable investigation in preparing a case or make a

reasonable decision no to conduct a particular investigation. <u>Kenley v. Armontrout,</u> 8th

Cir., 937 F.2d 1298, 1304, <u>cert. denied,</u> 112 S.Ct. 431 (1991). Before an attorney can

make a reasonable strategic choice against pursuing a certain line of investigation, the

attorney must obtain the facts necessary to make the decision. An attorney's "strategic

choices made after less than complete investigation are reasonable precisely to the extent

that reasonable professional judgment would support the limitations on investigation."

Id., citing Strickland v. Washington, supra, 466 U.S. at 690-91. Although courts generally

give great deference to an attorney's informed strategic choices, they closely scrutinize

any attorney's preparatory activities. See, for instance, Chambers v. Armontrout, 8th Cir.,

907 F.2d 825, 831, cert. denied, 498 U.S. 950 (1980).

     In addition, the ineffective assistance of counsel also applies to appellate counsel.

In Gray v. Green, 778, F2d at 353, held the Court appellate counsel failure to raise

significant and obvious issues could be viewed as deficient performance and if the issue

is not raised may have resulted in a reversal of the conviction or an order for a new trial

the failure was prejudicial. In this case, the Petitioner's appellate counsel never raised the

blanket issue or the newspaper issue on appeal. In the jury room during the trial, a

newspaper was brought into the jury room with an article concerning the Petitioner. The

caption on the article read "Accused Rapist Being Tried Yet Again?" At least two jurors

read the article and one juror read the headline. The Court interviewed the juror and ruled

as follows:

     The Court:    I refer to the Hughes case, 490 A.2d, 1035, the opinion of
the Delaware Supreme Court, which read at page 1040, "The accused's
right to a trial by a jury of his peers is fundamental to our criminal justice
system. An essential ingredient of that right is that the jury consist of
impartial or indifference jurors."

     It goes on further to say, "... if only one juror is improperly influenced, a
defendant in a criminal case is denied his Sixth Amendment right to an
impartial jury. It is not required, however, that each juror be completely
ignorant of the facts and issues involved in a particular case. Such a

requirement would be practically unattainable. The Supreme Court has
held that a prospective juror's knowledge of the facts and issues of the
case, or even a preconceived notion of guilt or innocence or a criminal
defendant, will not automatically disqualify a juror. It is sufficient if the
juror can lay aside his impression or opinion and render a verdict based on
the evidence presented in court. . . . the test is whether the nature and
strength of the opinion formed are such as in law necessarily. . . raise
the presumption of partiality."

        In this particular case, based upon both the reading of the article and the
voir dire of the jurors, I do not find that there was any opinion formed in
any of the three cases where they questioned on the newspaper article or,
indeed, from Juror Number 9, who was interviewed again concerning the
article - - I mean concerning the radio news report. I do not believe there
has been any bias formed at least there seems to have been none, and I can
detect none. But out of an abundance of caution, I think, counsel, what I'm
going to do is to excuse the alternate, who will be excused anyway, and
excuse Juror Number 9.

        This case is on its third trial, and I'm inclined to be a lot more cautious
under these circumstances, and given the multitude objections that have
been lodged, to remove any possibility of a problem in this regard. I see no
problem with Mr. Boggs at all, simply because he said he only saw the
headline.

        Mr. O'Donnell, you made the argument that he should be excused even if
he just saw it, but the reading of Hughes convinces me that you do not
have to be ignorant, and, indeed, if you found someone who was
completely ignorant in some circumstances, some factual circumstances, I
think you would have a juror without the requisite ability or mental

faculties to, indeed, be able to consider the issues and fairly distinguish or resolve them.

So, I think the most appropriate way to proceed is to excuse the two, and I'm wondering, counsel, I can do it - - I don't think there's any particular need to do it now. I think the full complement can sit for the final arguments, and then before the deliberations I will simply excuse 9 and 14, Mr. Carroll and Mr. Allen.

The defense had requested that all the three jurors been excused and a mistrial declared. The issue was never raised on appeal by Appellate counsel and clearly the failure to raise the issue amount to ineffective assistance of counsel. Appellate counsel need not advance every argument, but the issue must not fall below an objective standard of reasonableness. When the Petitioner alleges that Appellate counsel failed to raise a viable issue the Court must examine the trial record to determine whether appellate counsel failed to present significant and obvious issues.

The issue concerning the blanket was also not appealed by appellate counsel. The following is the Trial Court ruling and argument.

The Court:     The case law says you must show it is potentially exculpatory. Right now, the record is bare.

Even if I were to accept your letter, it says, "maybe so, maybe not." But I said, file an affidavit, present some testimony, do something which would establish this. And what you are telling me now, even today, the first day of trial, is that you have not made arrangements to have this person testify, or retain this person.

Given that situation, I have no choice but to deny the motion for those reasons stated.

Mr. Bartley:   Also, I can say - -

The Court:     I understand your argument.

Mr. Bartley:    I'm sure the FBI is going to make the same concession; that in fact, there could have been some exculpatory - -

The Court:      Well, Mr. Wharton, who doesn't claim to be - - at least I don't think he claims to be - - an expert in this area, unlike perhaps Judge Gebelein, has said, the state of the knowledge was, at this time.

Now, examine why and see, we didn't have this, and it wasn't accepted in this Court. If he is wrong, and I think it is proper for present purposes, you can surely bring in some evidence to the contrary.

But if you are going to do it, it would seem like it would be of record now, since you feel this is central to your case, or you'd be in a position to make a proffer now, and I don't hear that.

I am no trying to put you in a corner.

Mr. Bartley:    No, Your Honor.

Your Honor, we rest in the Motion in Limine almost exclusively on the fact there was found to be an agreement, which we didn't contend existed, and now we are trying to force that agreement.

The Court:      Wait a minute.

And now that's - - I will lay what I originally said aside. It's still effective and I still find that way. But if you switch what I consider arguments and go to that, Judge Babiarz specifically said, it's in effect until somebody gives notice.

Now, once that notice is given, then all bets are off. And in all candor - - well - - and that's the law of the case in terms of the viability of that agreement.

And from there, I thought you went to, well, it's unfair because we are prejudiced, and under these authorities, it should be excluded.

Mr. Bartley:    That's not where I went, Your Honor.

I also went to the fact it's unfair because they were able to preclude us from making certain closing argument based on that.

The Court:      That's done and over with.

Mr. Bartley:    That's how they enforce that agreement and we should have the same ability to enforce the agreement; in other words, the agreement now, with the blanket destroyed.

The Court:     Well, Mr. Bartley, Judge Babiarz said, Agreement in effect until one side or the other gives notice. October 12th, the State gives notice. Agreement no longer in effect.

I mean, I don't see any way around that. What you are saying, you are asking me to do two things; one, to go back and revisit a decision that another judge in the same court and in the same case has rendered, which I cannot do, absent a severe change of circumstances, or will not do. Two, you have denied that the agreement existed all this time and the - - I have ruled, and I will - - given the state of the record, given what I have asked you previously to do, not you personally but the defense, given the legal authority, I have not alternative but to deny the Motion in Limine at this point.

Mr. Wharton, I don't think it is necessary for the State to respond, given that decision; I don't think.

Mr. Bartley:     Your Honor, I accept the decision. May I say one further matter?

The Court:     I'm glad you do accept it, since you are stuck with it, anyway.

Mr. Bartley:     You did rely on Judge Babiarz's decision at the time, and at the time, he was not aware the blanket had been destroyed.

The Court:     I understand.

Mr. Bartley:     I want to reserve the right for appeal that he meant effectively, give effectiveness.

Even though the Petitioner's trial counsel re-indicated they wanted to appeal that issue, no appeal was filed on the issue. In addition, Petitioner's trial counsel failed to present any evidence that this blanket was "potentially exculpatory" as the trial court stated. The Petitioner's counsel presented no evidence prior to trial or at trial. A letter was submitted by Richard Safferstein, Ph.D. dated November 30, 1990 and the Petitioner obtained an affidavit of Mr. Safferstein on October 19, 1996 which clearly established

that potentially exculpatory evidence on the blanket since it could have positively

excluded the stain as originated from the Petitioner.

## Petitioner was denied a fair and impartial trial
## due to the destruction of evidence by the State.

In this case the State failed to preserve evidence that he Petitioner could have

hired his own expert to do D.N.A. testing on. In the case of Connecticut v. Harris, 631

A.2d 309 (1993),

> "evidence is material if there is reasonable probability had evidence been
> disclosed to defense results of proceedings would have been different;
> reasonable probability is probability sufficient to undermine confidence in
> outcome of proceedings."

In the Petitioner's case, the State was aware that the evidence was destroyed. The

evidence was not used in the first trial or the second trial, but was used in the third trial

which gave the State a more favorable chance to get a conviction especially since the

Petitioner could not produce any expert witness since the blanket was destroyed.

In Connecticut v. Michael Stinson, 633 A2d 728 the Court stated that:

> "exculpatory evidence is not suppressed within the meaning of Brady v.
> Maryland if it is not disclosed at trial in such situation, defendant must
> demonstrate that the timing of disclosure prejudiced him to the extent that
> he was deprived a fair trial."

The Petitioner contents that he already demonstrated the prejudice that is required

because the State used the evidence after if was destroyed. See Deberry v. State, Del.

Supr., 457 A2d 744 (1983),

"Furthermore the concept of balancing in itself implies that when loss of evidence has severely prejudiced the accused, the degree of culpability of the State is immaterial see <u>United States v. Loud Hawk</u>, 628 F. 2d at 11520."

In the Petitioner's case, the State produced evidence at trial that was taken from the baby blanket. The State's expert testified that it matched the defendant's blood group and also testified that it matched 36 percent of the population. The Petitioner contends that this evidence is not as strong as D.N.A. testing. The State's production of otherwise inconclusive scientific evidence when presumably strong evidence was available, or would have been if the evidence had been handled properly, implies that the strong evidence would have been adverse to the prosecution (see *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed 610 (1939); Wharton's Criminal Evidence, 145, at 246 (13th Ed. 1972); 29 Am. Jur. 2d Ed Evidence – 178 at 221-23 (1967). Petitioner contends that the loss of this evidence was prejudicial to his defense. If Petitioner could have had the evidence for the purpose of submitting that evidence for D.N.A. testing, that evidence could have exonerated the Petitioner according to Petitioner's expert Dr. Richard Saferstein.

In <u>Gibbs v. State</u>, Del.Supr., 479 A.2d 266 (1984) the Court stated that:

At the outset, we note that the analysis set forth in *Deberry* must be considered whenever there is a claim that potentially exculpatory evidence is lost or destroyed by the State. Under *Deberry,* that analysis must consider:

1)      would the request material, if extant in the possession of the State at the time of the defense request, have been subject to disclosure under Criminal Rule 16 or Brady?

2)      if so, did the government have a duty to preserve the material?

3)      if there was a duty to preserve, was the duty breached, and what
        consequences should flow from a breach?

*Id*. at 750 (footnotes omitted).

In particular, the third step in that analysis requires "a balance between the nature of the State's conduct and the degree of prejudice to the accused" *Id* at 752. In analyzing prejudice, the Court should weight:

> The centrality of the evidence to the case and its importance in
> establishing the elements of the crime or the motive or intent of the
> defendant; the probative value and reliability of the secondary or
> substitute evidence; the nature and probable weight of factual inferences
> or other demonstrations and kinds of proof allegedly lost to the accused;
> [and] the probable effect on the jury from the absence of the evidence…

*Id* at 752-753 (quoting <u>United States v. Loud Hawk,</u> 628 F. 2d 1139, 1152 (9th Cir. 1979) (Kennedy, J., concurring))

For instance, in *Deberry,* the alleged rape victim had suffered a serve cut to her hand. The defendant, believing that an absence of blood or semen on the pants he *270 [i]n light of the inconclusive results of the forensic tests, Deberry's clothes, on the basis of possible stains and hairs, could have disputed the victim's story. Furthermore, the absence of stains and hairs on his clothing would have been material to the issue of guilt since the evidence could have created a reasonable doubt not otherwise present.

*Id* at 749.

In <u>Deberry v. State</u>, Del. Supr., 457 A.2d 744 (1983) the Court states the
following:

> More specifically, when examining the conduct of the State, the court
> should inquire whether the evidence was lost of destroyed while in [the State's]
> custody, whether the [State] acted in disregard for the interest of the accused,
> whether [the State] was negligent in failing to adhere to established and
> reasonable standards of care for police and prosecutorial functions, and, if the acts
> were deliberate, whether they were taken in good faith or with reasonable
> justification… It is relevant also to inquire whether the government attorneys
> prosecuting the case have participated in the events leading to loss or destruction
> of the evidence, for prosecutorial action may bear upon existence of a motive to
> harm the accused.

*Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring). Particularly relevant to
this inquiry is testimony of persons who had custody of the material before its loss (and
after its loss, assuming recovery), any procedures for preserving evidence, specific
practices followed in the particular case, and steps taken to recover the lost material after
discovery of the loss. *E.g., Brown v. United States*, D.C.Ct.App., 372 A.2d 557, 560-61
(1977); *Johnson v. United States*, D.C.Ct.App., 298 A.2d 516, 519 (1972). Against this
must be weighed the prejudice to the defense resulting from the loss of such evidence.
When analyzing prejudice, the court should consider:

> The centrality of the evidence to the case and its importance in
> establishing the elements of the crime or the motive or intent of the defendant; the
> probative value and reliability of the secondary or substitute evidence; the nature
> and probable *753 weight of factual inferences or other demonstrations and kinds
> of proof allegedly lost to the accused; [and] the probable effect on the jury from
> absence of the evidence….

*Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring). *See, e.g., United States v. Grammatikos*, 633 F.2d 1013, 1020 (2d Cir.1980); *Government of the Virgin Islands v. Testamark*, 570 F.2d 1162, 1167 (3d Cir.1978); *United States v. Bryant*, 439 F.2d 642, 653 (D.C.Cir.1971). See Also <u>Davis v. Pitchess</u>, 388 F. Supp. 1974.

Having outlined the inquiry that a court should make, we find the record devoid of any explanations as to the loss of this evidence. Deberry says that the police removed all of his clothing from his room; one detective testified that another detective took the clothes; and the second detective denies doing so. In the usual situation, we would remand the case for additional findings of fact. *See Bryant*, 439 F.2d at 653; *Johnson,* 298 A.2d at 519. *See generally* 5 Am.Jur.2d *Appeal & Error* § 974, at 401-03 (1962). However, it is apparent that a remand in this case would add nothing to the record now before us. *See Bryant*, 439 F.2d at 653 (McGowan, J., concurring). Furthermore, the concept of balancing itself implies that when loss of evidence has severely prejudiced the accused, the degree of culpability of the State is immaterial. *See Loud Hawk*, 628 F.2d at 1152 (Kennedy, J., concurring); *United States v. Miranda*, 526 F.2d 1319, 1324, 1327 (2d Cir.1975); *Cotton v. United States*, D.C.Ct.App., 388 A.2d 865, 871 (1978). Therefore, deciding this case on the record as it now stands is not inconsistent with the general analysis we have adopted.

In <u>Hammond v. State</u>, Del. Supr.,  569 A.2d 81 (1989) the Court looked at the right of access to evidence:

> The first issue raised by Hammond on appeal, is that the failure of the Dover police to preserve the crash vehicle itself or to gather evidence of blood, clothing, tissue and fingerprints from inside of the crash vehicle, violated his constitutionally guaranteed right of access to evidence. *United States v.*

*Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). This Court has recognized that the "obligation to preserve evidence is rooted in the due process provisions of the fourteenth amendment to the United States Constitution and the Delaware Constitution, article I, section 7." (FN9) *Deberry v. State*, Del. Supr., 457 A.2d 744, 751-52 (1983). The independent and alternative constitutional bases for our holding in *Deberry* is particularly significant in view of subsequent development of the "access to evidence" doctrine in this Court and the United States Supreme Court. *See Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta,* 467 U.S. 479, 104 S.Ct.2528, 81 L.Ed.2d 413 (1984); *Bailey v. State*, Del.Supr., 521 A.2d 1069 (1987); *Hughes v. State,* Del.Supr., 490., A.2d 1034 (1985); *Deberry v. State*, 457 A.2d 744 (1983). A review of the evolution of these precedents is not only instructive but necessary for a proper evaluation of Hammond's claim.

### The Court also ruled that the defendant was not entitled to the inference that if the evidence was available it would have been exculpatory.

However, since the State must bear responsibility for the loss of evidence, Hammond was entitled to the inference that the crash vehicle, if available, would have been exculpatory. *Deberry v. State*, 457 A.2d at 754. "Due process" required an appropriate instruction to the jury in a prosecution for vehicular homicide, in the absence of the preservation of the crash vehicle or of secondary evidence having a probative value. *Deberry v. State*, 457 A.2d at 754; Del.Const. art. I, § 7. Such an instruction was given in *Arizona v. Youngblood*, even though no federal Constitutional right was found to have been violated. (FN22) 488 U.S. 51, 109 S.Ct. 333,335, 102 L.Ed.2d 281 (1988).

We must now determine the effect of the Superior Court's failure to give such an instruction. Hammond's expert witness was able to prepare a video tape of a test

supporting Hammond's theory of the hypothetical movement of the crash vehicle's occupants. Although Hammond's request for a jury instruction was denied, the Superior Court permitted Hammond's attorney to make "factual arguments," about the absence of the crash vehicle or any tests of its interior, to the jury and he did so forcefully. Given the strength of the State's case against Hammond, we are convinced beyond a reasonable doubt, that the Superior Court's failure to give a specific instruction was harmless error. *Michael v. State,* Del.Supr., 529 A.2d 752, 761 (1987); Del. Const. art I, § 7.

And in <u>Lunnon v. State</u>, Del.Supr., 710 A.2d 197 (1998) the Court addresses further the missing evidence instructions:

> As a matter of the State and Federal constitutional due process, the State is required to preserve evidence that may be material to a defendant's guilt or innocence. (FN3) The remedy for failure to preserve potentially exculpatory evidence is a missing evidence instruction commonly referred to as a *Lolly* or *Deberry* (FN5) instruction. This instruction requires that the jury infer that had the evidence been preserved, it would have been exculpatory to the defendant. (FN6)

In reviewing a claim that the State failed to preserve for trial potentially exculpatory evidence, this Court must consider:

1)    [whether] the requested material, if extant in the possession of the State at the time of the defense request, [would] have been subject to disclosure under Criminal Rule 16 or *Brady* [;]

2)    [and] if so, [whether] the government [had] a duty to preserve the material [;and]

*200 3)    [whether that State breached that duty and to what extent the]
consequences should flow from the breach? (FN7)

If fingerprints had been discovered on the bag and scale and were found to have belonged to someone other than Lunnon, they would have been "potentially exculpatory" and discoverable and the State would have had a duty to preserve the evidence. (FN8) Even assuming, arguendo, that fingerprints of someone other than Lunnon could have been discovered on the two items, we need address only the issue of what consequences would have resulted from the State's failure to have maintained the potentially exculpatory evidence. In doing so, this Court uses a three-part analysis that balances the State's conduct and the degree of prejudice to the accused. (FN9) The three factors to be considered are: the degree of negligence or bad faith in the State's conduct; the importance of missing evidence; (FN10) and the sufficiency of the other evidence presented at trial in supporting the conviction. (FN11)

In Lolly v. State, Del. Supr., 611 A.2d 956 (1992) the Court recommended the following missing evidence instructions:

> In this case, the Court has determined that the State failed to collect/preserve certain evidence which is material to the defense. The failure of the State to collect/preserve such evidence entitles the defendant to an inference that if such evidence were available at trial it would be exculpatory. This means that, for purposes of deciding this case, you are to assume that the missing evidence, had it been collected/preserved, would not have incriminated the defendant and would have tended to prove the defendant not guilty. The inference does not necessarily establish the defendant's innocence, however. If there is other evidence presented which establishes the fact or resolves the issue to which the missing evidence was material, you must weigh that evidence along with inference. Nevertheless, despite the inference concerning missing evidence, if you

conclude after examining all the evidence that the State has proven beyond a reasonable doubt all elements of the offenses(s) charged, you would be justified in returning a verdict of guilty.

*Id*. at 962 n.6.

Once it has been established that the State must bear responsibility for the loss of material evidence an appropriate jury instruction is required as a matter of due process under the Delaware Constitution. The Petitioner contends that by not giving a proper jury instruction undermined the fundamental legality reliability integrity of fairness of the proceedings leading to his conviction. Here the Petitioner contends that he has shown any prejudice that is required. Due to the Petitioner's due process rights that is guaranteed by the Delaware Constitution. The Petitioner has proved that (1) the State failed to preserve material evidence that was accessible and might have tended to exonerate him and (2) he was thereby prejudiced he is entitled to a "Willits" instruction (see *State v. Willits*, 393, P.2d 274 (Ariz. 1964) wherein it states;

"If you find that the State destroyed, caused to be destroyed, or allowed to be destroyed any evidence whose contents or quality are in issue, you may infer that the true fact is against the interest of the State."

Reversible error was also found in <u>State v. Lestie</u>, 708 P.2d 719 (Ariz. 1985) because Willits instructions was not given. The Defendant contends that there was a clear dereliction of duty on the part of a judge who does not instruct the jury to this point. For instance, Judge Robinson, concurring in *U.S. v. Young*, 463, F.2d 934, 945 (CADC 1972) said;

"Manifestly, without proper instruction jurors are apt to flounder through individual conceptions – which understandably may be misconceptions – of what the applicable law actually is."

In <u>U.S. v. Burton</u>, 898 F.2d 595 (1988);

"Absent witness instruction should be given when missing witness is peculiarly within control of one party…"

In this case, the State was in control of all the evidence that was taken from the baby blanket; the Defendant was unable to hire his own expert to analyze the evidence; and the Defendant was unable to put on a defense, all due to the destruction of this evidence by the State. Clearly, in this case, the Lolly instruction should have been given.

In this case, not only was the missing evidence instructions not used but also the jury was never informed that the evidence was destroyed. Therefore creating an inference in the jurors mind that the blanket was still available to the defense, which was clearly not the case. See affidavit attached to Motion.

**<u>Petitioner was denied his constitutional right to a fair<br>and important jury trial when juror were not disqualified.</u>**

In this case, a newspaper article was apparently in the jury room with the headlines "accused rapist being yet tried again." The Trial Court did not question all the jurors but only disqualified two and allowed a third juror to remain thereby allowing the third juror to contaminate the remaining panel.

The other two jurors admitted to reading the newspaper in the ***juror's room.*** The Petitioner contends that the rest of the jury should have been questioned during trial. The

Petitioner argues that by leaving the third juror deprived him of his right to a fair and impartial jury that is guaranteed by U.S.C.A. 6, 14. In the case <u>Hughes v. State</u>, Del.Supr. 490 A.2d 1034 (1985) citing the case <u>United States v. Williams</u> 568 F.2d 464 471 (5th Cir. 1978). It seems unreasonable to expect to a juror to divorce from his deliberative process, knowledge that a Defendant has been previously tied and convicted, and following a reversal has been once again subjected to prosecution. The mere expenditure of so much time and expense on the part of the state might lead to average lay person to assume that such a Defendant must in fact, be guilty. However, when prejudicial information is acquired by jurors during trial, there is a high risk that the prejudicial information will be held against the accused. Such situations call for an even stricter standard than those in which the information was already known on account of pretrial situations. <u>United States v. Williams,</u> 568 F.2d 464, 467 (5th Cir. 1987) See also <u>Parker v. Gladden</u>, 385 U.S. 363, 87 S.ct. 468, 17 L. Ed.2d 420 (1966); <u>Mattox v. United States</u>, 146 U.S. 140, 13 S.ct. 50, 36 L.ed.2d 917 (1982) (where the Supreme Court concluded that jurors could not remain impartial in such circumstances.) One particular case which merits special attention is <u>United States v. Williams</u>, 568 F.2d 464 (5th Cir. 1987). There, at least five jurors knew of, and two jurors actually saw a news broadcast during the trial which mentioned the Defendant's prior conviction and the subsequent grant of new trial. There, as here, the trial judge had an opportunity to assess the extent of juror knowledge through and adequate vior dire. In Williams, the Fifth Circuit Court of Appeals reviewed the line of United States Supreme Court cases dealing with prejudicial publicity and followed, as we do, the Rule of <u>Marshall v. United States</u>, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) that news stories during trial which reveal to jurors the Defendant's

prior criminal record are "inherently prejudicial." United States v. Williams, 568 F.2d at

469; see also Murphy v. Florida, 421 U.S. at 798, 95 S.Ct at1035. The Circuit Court

extended this presumption of prejudice to cases where jurors learn about the Petitioner's

conviction in a prior trial. It found this knowledge "even more damaging," than

knowledge of the Petitioner's prior criminal acts, because this information "could easily

be interpreted by a layman as meaning that "the Defendant got off on a technicality,"

United States v. Williams, 568 F.2d. at 470. See also United States v. Attell, 655 F.2d at

705. Considering the nature of its extremely difficult for Petitioner to demonstrate that

jurors were actually biased by prejudicial information to which they were exposed. See

Peters v. Kiff, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); Barnes v. Toppin,

Del.Supr., 482 A.2d 749 (1984). Under these circumstances, requiring a Defendant to

show "actual bias" would be too onerous a burden to impose. The Supreme Court has

observed "…even if there is no showing of actual basis in the tribunal, this Court has held

that the due process is denied by circumstances that create the likelihood or the

appearance of bias." Peters v. Kiff, 407 U.S. 493, 502, 92 S.Ct., 2163, 32 L.Ed.2d 83

(1972). See also Jackson v. State, Del.Supr., 374 A.2d 1 (1977).

During the trial, three members of the jury were questioned concerning

misconduct. This line of questioning lead to two of the jury members being disqualified.

The other one juror were allowed to remain on the jury, even though one had admitted to

having access to the newspaper. The Petitioner claims that this should not have happened

and that the jury member should have been disqualified. The juror claimed that he did not

read the newspaper, but the Petitioner contents that this juror was contaminated due to the

fact that he had so much as access to the newspaper. In the case of <u>Tillman v. United States,</u> 406, F.2d 930 (1969) it states;

> "If only one juror is improperly influenced, the trial is unfair as if every juror was influenced."

In the case <u>Sheppard v. Maxwell</u>, 384 U.S. 333 the Supreme Court stated that;

> "Due process required that he accused received a trial by impartial jury free from outside influence. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused, the appellate tribunals have the duty to make an independent evaluation of the circumstances."

There is only one logical reason why the other juror was not disqualified, if the Petitioner can say it so can everyone else, and that is because the court did not want to declare a mistrial under any circumstances, and unfortunately, the Defendant's Constitutional Rights to a fair trial was not enough to restrict his desire to accomplish this.

## <u>CONCLUSION</u>

In Conclusion, the Petitioner's Writ of Habeas Corpus should be granted by this

Honorable Court.

 

 

_____

**LEO JOHN RAMUNNO, ESQUIRE**
1205 N. King Street
Wilmington, DE 19801
302-654-0660
Attorney for Petitioner

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **TIMMY GOODWIN** | : | |
| | : | |
| **Petitioner,** | : | **C.A. No. _____** |
| | : | |
| **v.** | : | |
| | : | |
| **STATE OF DELAWARE and** | : | |
| **DEPARTMENT OF CORRECTIONS,** | : | |
| | : | |
| **Respondents.** | : | |

## <u>CERTIFICATE OF SERVICE</u>

     **I, LEO JOHN RAMUNNO, ESQUIRE** hereby certify that on this _____ day of _____, 2006, I have caused within the ***Petitioner's Memorandum Writ of Habeas Corpus under 28 U.S.C. § 2254*** to be sent via First Class Mail to the following:

     Carl Danberg
     Attorney General
     820 N. French Street, 7th Floor
     Wilmington, DE 19801


                           _____
                           **LEO JOHN RAMUNNO, ESQUIRE**
                           1205 N. King Street
                           Wilmington, DE 19801
                           302-654-0660
                           Attorney for Petitioner